STEVEN L. FRIEDLANDER (SBN 154146)
SCOTT E. ATKINSON (SBN 251996)
GALEN P. SALLOMI (SBN 306743)
SV EMPLOYMENT LAW FIRM PC
160 Bovet Road, Suite 401
San Mateo, CA  94402
Telephone:     (650) 265-0222
Facsimile:     (650) 265-0223
Email:         sfriedlander@svelf.com
               satkinson@svelf.com
               gsallomi@svelf.com

RICHARD A. GRIMM (SBN 177463)
JOHN P. DEAN (DC BAR 362904)
LAW OFFICE OF RICHARD GRIMM
2391 The Alameda, Suite 200
Santa Clara, CA 95050
Telephone     (650) 248-5487
Facsimile     (650) 618-9856
Email:         richard@richardgrimm.com

Attorneys for Plaintiff JEFFREY SANTELICES

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **JEFFREY SANTELICES,**<br><br>                **Plaintiff,**<br><br>       **vs.**<br><br>**APTTUS CORPORATION; PROJECT EVEREST PARENT, LLC; PROJECT EVEREST HOLDINGS, LLC; and DOES 1 through 50,**<br><br>                **Defendants.** | **Case No. 4:19-cv-07414-HSG**<br><br>**PLAINTIFF'S STATEMENT OF RECENT DECISION RELEVANT TO HIS MOTION TO REMAND**<br><br>**Judge:** **Hon. Haywood S. Gilliam, Jr.**<br><br>**Hearing Date: February 6, 2020** |

Pursuant to Civil Local Rule 7-3(d), Plaintiff Jeffrey Santelices respectfully submits this Statement of Recent Decision to inform the Court of the Supreme Court's decision in *Atlantic Richfield Co. v. Christian,* No. 17-1498 (U.S. April 20, 2020) (attached as Exhibit 1).  The Court's discussion of "arising under" jurisdiction on page 9 of the slip opinion, including footnote 4,

1  supports the argument on page 2 of Plaintiff's Motion to Remand (Dkt. 27, filed December

2  12, 2019) and page 3 of Plaintiff's Reply in Support of that Motion. (Dkt. 33, filed December

3  30, 2019).

4

5

   Dated: April 22, 2020                          LAW OFFICE OF RICHARD GRIMM

6

7                                                 By: **/s/ John P. Dean**_____

8                                                  Richard A. Grimm
                                                   John P. Dean
9

10                                                SV EMPLOYMENT LAW FIRM PC

11                                                Steven L. Friedlander
                                                  Scott E. Atkinson
12                                                Galen P. Sallomi
                                                  Attorneys for Plaintiff JEFFREY SANTELICES
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I hereby certify that I filed this document using the Court's electronic filing system, thereby serving all counsel of record.

/s/ *John P. Dean*
John P. Dean

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**EXHIBIT ONE**

PLAINTIFF'S STATEMENT OF RECENT DECISION,  NO. 4:19-cv-07414-HSG

(Slip Opinion)       OCTOBER  TERM,  2019       1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is
being done in connection with this case, at the time the opinion is issued.
The syllabus constitutes no part of the opinion of the Court but has been
prepared by the Reporter of Decisions for the convenience of the reader.
See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## ATLANTIC RICHFIELD CO. *v.* CHRISTIAN ET AL.

### CERTIORARI TO THE SUPREME COURT OF MONTANA

No. 17–1498. Argued December 3, 2019—Decided April 20, 2020

The Comprehensive Environmental Response, Compensation, and Lia-
bility Act, 42 U. S. C. §9601 *et seq.*, also known as the Superfund stat-
ute, promotes "the timely cleanup of hazardous waste sites and [en-
sures] that the costs of such cleanup efforts [are] borne by those
responsible for the contamination," *CTS Corp.* v. *Waldburger*, 573
U. S. 1, 4 (internal quotation marks omitted). The Act directs the En-
vironmental Protection Agency to compile and annually revise a prior-
itized list of contaminated sites for cleanup, known as Superfund sites,
and makes responsible parties liable for the cost of the cleanup. Before
a cleanup plan is selected, a remedial investigation and feasibility
study is conducted to assess the contamination and evaluate cleanup
options. Once that study begins, §122(e)(6) of the Act provides, "no
potentially responsible party may undertake any remedial action" at
the site without EPA approval. To insulate cleanup plans from collat-
eral attack, §113(b) provides federal district courts with "exclusive
original jurisdiction over all controversies arising under" the Act, and
§113(h) then strips those courts of jurisdiction "to review any chal-
lenges to removal or remedial action," except in five limited circum-
stances.

For nearly a century, the Anaconda Copper Smelter in Butte, Mon-
tana contaminated an area of over 300 square miles with arsenic and
lead. Over the past 35 years, EPA has worked with the current owner
of the now-closed smelter, Atlantic Richfield Company, to implement
a cleanup plan for a remediation expected to continue through 2025.
A group of 98 landowners sued Atlantic Richfield in Montana state
court for common law nuisance, trespass, and strict liability, seeking
restoration damages, which Montana law requires to be spent on prop-
erty rehabilitation. The landowners' proposed plan exceeds the

2             ATLANTIC RICHFIELD CO. *v.* CHRISTIAN

Syllabus

measures found necessary to protect human health and the environment by EPA. The trial court granted summary judgment to the landowners on the issue of whether the Act precluded their restoration damages claim and allowed the lawsuit to continue. After granting a writ of supervisory control, the Montana Supreme Court affirmed, rejecting Atlantic Richfield's argument that §113 stripped the Montana courts of jurisdiction over the landowners' claim and concluding that the landowners were not potentially responsible parties (or PRPs) prohibited from taking remedial action without EPA approval under §122(e)(6).

*Held*:

   1. This Court has jurisdiction to review the Montana Supreme Court's decision. To qualify as a final judgment subject to review under 28 U. S. C. §1257(a), a state court judgment must be "an effective determination of the litigation and not of merely interlocutory or intermediate steps therein." *Jefferson* v. *City of Tarrant*, 522 U. S. 75, 81. Under Montana law, a supervisory writ proceeding is a self-contained case, not an interlocutory appeal. Mont. Const., Art. VII, §§2(1)–(2); Mont. Rules App. Proc. 6(6), 14(1), 14(3). Thus, the writ issued in this case is a "final judgment" within this Court's jurisdiction. *Fisher* v. *District Court of Sixteenth Judicial Dist. of Mont.*, 424 U. S. 382, 385, n. 7. P. 8.

   2. The Act does not strip the Montana courts of jurisdiction over this lawsuit. Section 113(b) of the Act provides that "the United States district courts shall have exclusive original jurisdiction over all controversies arising under this chapter," so state courts lack jurisdiction over such actions. The use of "arising under" in §113(b) echoes Congress's more familiar use of that phrase in granting federal courts jurisdiction over "all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U. S. C. §1331. In the mine run of cases, "[a] suit arises under the law that creates the cause of action." *American Well Works Co.* v. *Layne & Bowler Co.*, 241 U. S. 257, 260. The landowners' common law nuisance, trespass, and strict liability claims arise under Montana law and not under the Act.

   Atlantic Richfield mistakenly argues that §113(h)—which states that "[n]o Federal court shall have jurisdiction under Federal law . . . to review any challenges to removal or remedial action" selected under the Act—implicitly broadens the scope of actions precluded from state court jurisdiction under §113(b). But §113(h) speaks of "Federal court[s]," not state courts. There is no textual basis for Atlantic Richfield's argument that Congress precluded *state* courts from hearing a category of cases in §113(b) by stripping *federal* courts of jurisdiction over those cases in §113(h). Often the simplest explanation is the best: Section 113(b) deprives state courts of jurisdiction over cases "arising

under" the Act—just as it says—while §113(h) deprives federal courts of jurisdiction over certain "challenges" to Superfund remedial actions—just as it says. Pp. 8–13.

3. The Montana Supreme Court erred by holding that the landowners were not potentially responsible parties under the Act and thus did not need EPA approval to take remedial action. To determine who is a potentially responsible party, the Court looks to the list of "covered persons" in §107, the Act's liability section, which includes any "owner" of "a facility." "Facility" in turn is defined to include "any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located." 42 U. S. C. §9601(9)(B). Because arsenic and lead are hazardous substances that have "come to be located" on the landowners' properties, the landowners are potentially responsible parties.

The landowners argue they are no longer potentially responsible parties because the Act's six-year limitations period for recovery of remedial costs has run, and thus they could not be held liable in a hypothetical lawsuit. But even "'innocent' . . . landowner[s] whose land has been contaminated by another," and who are thus shielded from liability by §107(b)(3)'s so-called "innocent landowner" or "third party" defense, "may fall within the broad definitions of PRPs in §§107(a)(1)–(4)." *United States* v. *Atlantic Research Corp.*, 551 U. S. 128, 136. The same principle holds true for parties facing no liability because of the Act's limitations period.

Interpreting "potentially responsible parties" to include owners of polluted property reflects the Act's objective to develop a "Comprehensive Environmental Response" to hazardous waste pollution. Section 122(e)(6) is one of several tools in the Act that ensure the careful development of a single EPA-led cleanup effort rather than tens of thousands of competing individual ones.

Yet under the landowners' interpretation, property owners would be free to dig up arsenic-infected soil and build trenches to redirect lead-contaminated groundwater without even notifying EPA, so long as they have not been sued within six years of commencement of the cleanup. Congress did not provide such a fragile remedy for such a serious problem.

The landowners alternatively argue that they are not potentially responsible parties because they did not receive the notice of settlement negotiations required by §122(e)(1). EPA has a policy of not suing innocent homeowners for pollution they did not cause, so it did not include the landowners in settlement negotiations. But EPA's nonenforcement policy does not alter the landowners' status as potentially responsible parties. Section 107(a) unambiguously defines potentially

Syllabus

responsible parties, and EPA does not have authority to alter that definition.

The landowners also argue that §122(e)(6) cannot carry the weight ascribed to it because it is located in the section on settlement negotiations. Settlements, however, are the heart of the Superfund statute. Section 122(a) of the Act commands EPA to proceed by settlement "[w]henever practicable and in the public interest . . . in order to expedite effective remedial actions and minimize litigation." And EPA's efforts to negotiate settlement agreements and issue orders for cleanups account for approximately 69% of all cleanup work currently underway. Pp. 13–21.

390 Mont. 76, 408 P. 3d 515, affirmed in part, vacated in part, and remanded.

ROBERTS, C. J., delivered the opinion of the Court, Parts I and II–A of which were unanimous, Part II–B of which was joined by THOMAS, GINSBURG, BREYER, SOTOMAYOR, KAGAN, GORSUCH, and KAVANAUGH, JJ., and Part III of which was joined by GINSBURG, BREYER, ALITO, SOTOMAYOR, KAGAN, and KAVANAUGH, JJ. ALITO, J., filed an opinion concurring in part and dissenting in part. GORSUCH, J., filed an opinion concurring part and dissenting in part, in which THOMAS, J., joined.

Cite as:  590 U. S. ____ (2020)          1

Opinion of the Court

NOTICE: This opinion is subject to formal revision before publication in the
preliminary print of the United States Reports.  Readers are requested to
notify the Reporter of Decisions, Supreme Court of the United States, Wash-
ington, D. C. 20543, of any typographical or other formal errors, in order that
corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

_____

No. 17–1498

_____

## ATLANTIC RICHFIELD COMPANY, PETITIONER *v.* GREGORY A. CHRISTIAN, ET AL.

### ON WRIT OF CERTIORARI TO THE SUPREME COURT OF MONTANA

[April 20, 2020]

CHIEF JUSTICE ROBERTS delivered the opinion of the Court.

For nearly a century, the Anaconda Copper Smelter in Butte, Montana contaminated an area of over 300 square miles with arsenic and lead.  Over the past 35 years, the Environmental Protection Agency has worked with the current owner of the smelter, Atlantic Richfield Company, to implement a cleanup plan under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980.  EPA projects that the cleanup will continue through 2025.

A group of 98 landowners sued Atlantic Richfield in Montana state court for common law nuisance, trespass, and strict liability.  Among other remedies, the landowners sought restoration damages, which under Montana law must be spent on rehabilitation of the property.  The landowners' proposed restoration plan includes measures beyond those the agency found necessary to protect human health and the environment.

We consider whether the Act strips the Montana courts of jurisdiction over the landowners' claim for restoration

damages and, if not, whether the Act requires the land-owners to seek EPA approval for their restoration plan.

## I

### A

In 1980, Congress enacted the Comprehensive Environmental Response, Compensation, and Liability Act, 94 Stat. 2767, as amended, 42 U. S. C. §9601 *et seq.*, also known as the Superfund statute, to address "the serious environmental and health risks posed by industrial pollution," *Burlington N. & S. F. R. Co.* v. *United States*, 556 U. S. 599, 602 (2009). The Act seeks "to promote the timely cleanup of hazardous waste sites and to ensure that the costs of such cleanup efforts [are] borne by those responsible for the contamination." *CTS Corp.* v. *Waldburger*, 573 U. S. 1, 4 (2014) (internal quotation marks omitted).

The Act directs EPA to compile and annually revise a prioritized list of contaminated sites for cleanup, commonly known as Superfund sites. 42 U. S. C. §9605.[1] EPA may clean those sites itself or compel responsible parties to perform the cleanup. §§9604, 9606, 9615. If the Government performs the cleanup, it may recover its costs from responsible parties. §9607(a)(4)(A). Responsible parties are jointly and severally liable for the full cost of the cleanup, but may seek contribution from other responsible parties. §9613(f)(1).

Prior to selecting a cleanup plan, EPA conducts (or orders a private party to conduct) a remedial investigation and feasibility study to assess the contamination and evaluate cleanup options. 40 CFR §300.430 (2019). Section 122(e)(6) of the Act provides that, once the study begins, "no poten-

----

[1] The Act vests powers and duties in the President, who has delegated the responsibilities relevant here to the EPA Administrator. See 42 U. S. C. §9615; Exec. Order No. 12580, 3 CFR §193 (1988).

tially responsible party may undertake any remedial action" at the site without EPA approval. 42 U. S. C. §9622(e)(6).

The Act prescribes extensive public consultation while a cleanup plan is being developed. It requires an opportunity for public notice and comment on proposed cleanup plans. §§9613(k), 9617. It requires "substantial and meaningful involvement by each State in initiation, development, and selection" of cleanup actions in that State. §9621(f)(1). And, in most instances, it requires that remedial action comply with "legally applicable or relevant and appropriate" requirements of state environmental law. §9621(d)(2)(A).

But once a plan is selected, the time for debate ends and the time for action begins. To insulate cleanup plans from collateral attack, §113(b) of the Act provides federal district courts with "exclusive original jurisdiction over all controversies arising under" the Act, and §113(h) then strips such courts of jurisdiction "to review any challenges to removal or remedial action," except in five limited circumstances. §§9613(b), (h).

B

Between 1884 and 1902, the Anaconda Copper Mining Company built three copper smelters 26 miles west of the mining town of Butte, Montana. The largest one, the Washoe Smelter, featured a 585-foot smoke stack, taller than the Washington Monument. The structure still towers over the area today, as part of the Anaconda Smoke Stack State Park. Together, the three smelters refined tens of millions of pounds of copper ore mined in Butte, the "Richest Hill on Earth," to feed burgeoning demand for telephone wires and power lines. M. Malone, The Battle for Butte 34 (1981). "It was hot. It was dirty. It was dangerous. But it was a job for thousands." Dunlap, A Dangerous Job That Gave Life to a Town: A Look Back at the Anaconda Smelter,

Montana Standard (Aug. 8, 2018). From 1912 to 1973, Anaconda Company payrolls totaled over $2.5 billion, compensating around three-quarters of Montana's work force.

Bust followed boom. By the 1970s, the falling price of copper, an ongoing energy crisis, and the nationalization of Anaconda's copper mines in Chile and Mexico squeezed Anaconda. But what others saw as an ailing relic, Atlantic Richfield saw as a turnaround opportunity, purchasing the Anaconda Company for the discount price of $700 million. Unfortunately, Atlantic Richfield was unable to revive Anaconda's fortunes. By 1980 Atlantic Richfield had closed the facility for good, and by 1984 Fortune had dubbed the purchase one of the "Decade's Worst Mergers." Fisher, The Decade's Worst Mergers, Fortune, Apr. 30, 1984, p. 262.

Atlantic Richfield's troubles were just beginning. After Congress passed the Superfund statute in 1980, Atlantic Richfield faced strict and retroactive liability for the many tons of arsenic and lead that Anaconda had spewed across the area over the previous century. In 1983, EPA designated an area of more than 300 square miles around the smelters as one of the inaugural Superfund sites. 48 Fed. Reg. 40667. In the 35 years since, EPA has managed an extensive cleanup at the site, working with Atlantic Richfield to remediate more than 800 residential and commercial properties; remove 10 million cubic yards of tailings, mine waste, and contaminated soil; cap in place 500 million cubic yards of waste over 5,000 acres; and reclaim 12,500 acres of land. EPA, Superfund Priority "Anaconda" 9 (Apr. 2018), https://semspub.epa.gov/work/08/100003986.pdf. To date, Atlantic Richfield estimates that it has spent roughly $450 million implementing EPA's orders.

More work remains. As of 2015, EPA's plan anticipated cleanup of more than 1,000 additional residential yards, revegetation of 7,000 acres of uplands, removal of several waste areas, and closure of contaminated stream banks and railroad beds. Brief for United States as *Amicus Curiae*

Opinion of the Court

7–8 (citing EPA, Fifth Five-Year Review Report: Anaconda Smelter Superfund Site, Anaconda-Deer Lodge County, Montana, Table 10–1 (Sept. 25, 2015), https://semspub.epa. gov/work/08/1549381.pdf ).   EPA projects that remedial work will continue through 2025. *Id.*, Table 10–7; Tr. of Oral Arg. 30.

## C

In 2008, a group of 98 owners of property within the Superfund site filed this lawsuit against Atlantic Richfield in Montana state court, asserting trespass, nuisance, and strict liability claims under state common law.  The landowners sought restoration damages, among other forms of relief.

Under Montana law, property damages are generally measured by the "difference between the value of the property before and after the injury, or the diminution in value." *Sunburst School Dist. No. 2* v. *Texaco, Inc.*, 338 Mont. 259, 269, 165 P. 3d 1079, 1086 (2007).  But "when the damaged property serves as a private residence and the plaintiff has an interest in having the property restored, diminution in value will not return the plaintiff to the same position as before the tort." *Id.*, at 270, 165 P. 3d, at 1087.  In that circumstance, the plaintiff may seek restoration damages, even if they exceed the property's diminution in value. See *ibid.*; Restatement (Second) of Torts §929, and Comment *b* (1977).

To collect restoration damages, a plaintiff must demonstrate that he has "reasons personal" for restoring the property and that his injury is temporary and abatable, meaning "[t]he ability to repair [the] injury must be more than a theoretical possibility." *Sunburst School Dist. No. 2*, 338 Mont., at 269, 165 P. 3d, at 1086–1087.  The injured party must "establish that the award actually will be used for restoration." *Lampi* v. *Speed*, 362 Mont. 122, 130, 261 P. 3d 1000, 1006 (2011).

Opinion of the Court

The landowners here propose a restoration plan that goes beyond EPA's own cleanup plan, which the agency had found "protective of human health and the environment." EPA, Community Soils Operable Unit, Record of Decision (1996), App. 62.  See also 42 U. S. C. §9621(d)(1).  For example, the landowners propose a maximum soil contamination level of 15 parts per million of arsenic, rather than the 250 parts per million level set by EPA.  And the landowners seek to excavate offending soil within residential yards to a depth of two feet rather than EPA's chosen depth of one.  The landowners also seek to capture and treat shallow groundwater through an 8,000-foot long, 15-foot deep, and 3-foot wide underground permeable barrier, a plan the agency rejected as costly and unnecessary to secure safe drinking water.

The landowners estimate that their cleanup would cost Atlantic Richfield $50 to $58 million.  Atlantic Richfield would place that amount in a trust and the trustee would release funds only for restoration work.

In the trial court, Atlantic Richfield and the landowners filed competing motions for summary judgment on whether the Act precluded the landowners' claim for restoration damages.[2]  The court granted judgment for the landowners on that issue and allowed the lawsuit to continue.  After granting a writ of supervisory control, the Montana Supreme Court affirmed.  *Atlantic Richfield Co.* v. *Montana Second Jud. Dist. Ct.*, 390 Mont. 76, 408 P. 3d 515 (2017).

The Montana Supreme Court rejected Atlantic Richfield's

─────────────

[2] Atlantic Richfield concedes that the Act preserves the landowners' claims for other types of compensatory damages under Montana law, including loss of use and enjoyment of property, diminution of value, incidental and consequential damages, and annoyance and discomfort.  See *Atlantic Richfield Co.* v. *Montana Second Jud. Dist. Ct.*, 390 Mont. 76, 79, 408 P. 3d 515, 518 (2017).  We therefore consider only the landowners' claim for restoration damages.

Opinion of the Court

argument that §113 stripped the Montana courts of juris-diction over the landowners' claim for restoration damages. The court recognized that §113 strips federal courts (and, it was willing to assume, state courts) of jurisdiction to review challenges to EPA cleanup plans. But the Montana Su-preme Court reasoned that the landowners' plan was not such a challenge because it would not "stop, delay, or change the work EPA is doing." *Id.*, at 83, 408 P. 3d, at 520. The landowners were "simply asking to be allowed to pre-sent their own plan to restore their own private property to a jury of twelve Montanans who will then assess the merits of that plan." *Id.*, at 84, 408 P. 3d, at 521.

The Montana Supreme Court also rejected Atlantic Rich-field's argument that the landowners were potentially re-sponsible parties (sometimes called PRPs) prohibited from taking remedial action without EPA approval under §122(e)(6) of the Act. The Court observed that the landown-ers had "never been treated as PRPs for any purpose—by either EPA or [Atlantic Richfield]—during the entire thirty-plus years" since the designation of the Superfund site, and that the statute of limitations for a claim against the land-owners had run. *Id.*, at 86, 408 P. 3d, at 522. "Put simply, the PRP horse left the barn decades ago." *Ibid.*

Justice Baker concurred, stressing that on remand Atlan-tic Richfield could potentially defeat the request for resto-ration damages on the merits by proving that the restora-tion plan conflicted with EPA's cleanup plan. *Id.*, at 87–90, 408 P. 3d, at 523–525. Justice McKinnon dissented. She argued that the landowners' restoration plan did conflict with the Superfund cleanup and thus constituted a chal-lenge under §113(h) of the Act, over which Montana courts lacked jurisdiction. *Id.*, at 90–101, 408 P. 3d, at 525–532.

We granted certiorari. 587 U. S. ___ (2019).

## II

We begin with two threshold questions: whether this

Opinion of the Court

Court has jurisdiction to review the decision of the Montana Supreme Court and, if so, whether the Montana courts have jurisdiction over the landowners' claim for restoration damages.

A

Congress has authorized this Court to review "[f]inal judgments or decrees rendered by the highest court of a State." 28 U. S. C. §1257(a). To qualify as final, a state court judgment must be "an effective determination of the litigation and not of merely interlocutory or intermediate steps therein." *Jefferson* v. *City of Tarrant*, 522 U. S. 75, 81 (1997). The landowners contend that, because the Montana Supreme Court allowed the case to proceed to trial, its judgment was not final and we lack jurisdiction.

But the Montana Supreme Court exercised review in this case through a writ of supervisory control. Under Montana law, a supervisory writ proceeding is a self-contained case, not an interlocutory appeal. Mont. Const., Art. VII, §§2(1)–(2); Mont. Rules App. Proc. 6(6), 14(1), 14(3) (2019). Thus we have held that a "writ of supervisory control issued by the Montana Supreme Court is a final judgment within our jurisdiction." *Fisher* v. *District Court of Sixteenth Judicial Dist. of Mont.*, 424 U. S. 382, 385, n. 7 (1976) (*per curiam*).

The landowners protest that our precedents only support reviewing supervisory writ proceedings that are limited to jurisdictional questions. But the scope of our jurisdiction to review supervisory writ proceedings is not so restricted. When the Montana Supreme Court issues a writ of supervisory control, it initiates a separate lawsuit. It is the nature of the Montana proceeding, not the issues the state court reviewed, that establishes our jurisdiction.

B

We likewise find that the Act does not strip the Montana courts of jurisdiction over this lawsuit. It deprives state

courts of jurisdiction over claims brought under the Act. But it does not displace state court jurisdiction over claims brought under other sources of law.[3]

Section 113(b) of the Act provides that "the United States district courts shall have exclusive original jurisdiction over all controversies arising under this chapter," so state courts lack jurisdiction over such actions. 42 U. S. C. §9613(b). This case, however, does not "arise under" the Act. The use of "arising under" in §113(b) echoes Congress's more familiar use of that phrase in granting federal courts jurisdiction over "all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U. S. C. §1331. In the mine run of cases, "[a] suit arises under the law that creates the cause of action." *American Well Works Co.* v. *Layne & Bowler Co.*, 241 U. S. 257, 260 (1916).[4] The landowners' common law claims for nuisance, trespass, and strict liability therefore arise under Montana law and not under the

_____

[3] JUSTICE ALITO argues that this jurisdictional question "may turn out not to matter in this case" because we remand for further proceedings that may end the litigation. *Post*, at 2 (opinion concurring in part and dissenting in part). But Atlantic Richfield seeks more than a remand. It contends that the lawsuit should be *dismissed* because the Montana courts lack jurisdiction, and the Federal Government agrees. The difference between outright dismissal and further proceedings matters. We granted review of this issue and both parties have fully briefed and argued it. Simply leaving the question unanswered at this point would leave the parties in a state of uncertainty as to whether the litigation is proceeding in the proper forum. We therefore find it both "necessary" and "prudent" to decide the issue. *Post*, at 1.

[4] There is a "special and small category of cases" that originate in state law yet still arise under federal law for purposes of federal question jurisdiction. *Gunn* v. *Minton*, 568 U. S. 251, 258 (2013) (internal quotation marks omitted). To qualify for this narrow exception, a state law claim must "necessarily raise[]" a federal issue, among other requirements. *Ibid.* No element of the landowners' state common law claims necessarily raises a federal issue. Atlantic Richfield raises the Act as an affirmative defense, but "[f]ederal jurisdiction cannot be predicated on an actual or anticipated defense." *Vaden* v. *Discover Bank*, 556 U. S. 49, 60 (2009).

Opinion of the Court

Act.  As a result, the Montana courts retain jurisdiction over this lawsuit, notwithstanding the channeling of Superfund claims to federal courts in §113(b).[5]

Atlantic Richfield takes a different view, arguing that §113(h) implicitly broadens the scope of actions precluded from state court jurisdiction under §113(b).  Section 113(h) states that "[n]o Federal court shall have jurisdiction under Federal law other than under section 1332 of title 28 (relating to diversity of citizenship jurisdiction) . . . to review any challenges to removal or remedial action" selected under the Act.  42 U. S. C. §9613(h).

The company's argument proceeds in five steps.  Step one: Section 113(h) removes federal court jurisdiction over all cleanup challenges, regardless of whether they originate in federal or state law (except for when the court is sitting in diversity).  Step two: Section 113(h) can only remove jurisdiction that §113(b) provides in the first place.  Step three: Section 113(b) thus provides federal courts jurisdiction over all cleanup challenges, whether brought under federal or state law.  Step four: The grant of jurisdiction to federal courts in §113(b) is exclusive to federal courts.  Step five: State courts thus do not have jurisdiction over cleanup challenges.

This interpretation faces several insurmountable obstacles.  First, by its own terms, §113(h) speaks of "Federal court[s]," not state courts.  There is no textual basis for Atlantic Richfield's argument that Congress precluded *state*

_____

[5] Section 113(b) specifies that federal courts have exclusive jurisdiction "without regard to the citizenship of the parties or the amount in controversy."  42 U. S. C. §9613(b).  This is somewhat redundant because all actions that "arise under" the Act necessarily satisfy federal question jurisdiction.  But "[s]ometimes the better overall reading of the statute contains some redundancy."  *Rimini Street, Inc.* v. *Oracle USA, Inc.*, 586 U. S. ___, ___ (2019) (slip op., at 11).  We find it much more likely that Congress employed a belt and suspenders approach to make sure that *all* CERCLA lawsuits are routed to federal court than that Congress intended the reference to federal courts in §113(h) to affect state courts.

Opinion of the Court

courts from hearing a category of cases in §113(b) by stripping *federal* courts of jurisdiction over those cases in §113(h).  And if that were Congress's goal, it would be hard to imagine a more oblique way of achieving it.  Often the simplest explanation is the best: Section 113(b) deprives state courts of jurisdiction over cases "arising under" the Act—just as it says—while §113(h) deprives federal courts of jurisdiction over certain "challenges" to Superfund remedial actions—just as it says.

Second, the company's argument does not account for the exception in §113(h) for federal courts sitting in diversity.  Section 113(h) permits federal courts in diversity cases to entertain state law claims regardless of whether they are challenges to cleanup plans.  See *DePue* v. *Exxon Mobil Corp.*, 537 F. 3d 775, 784 (CA7 2008).  But Atlantic Richfield does not even try to explain why the Act would permit such state law claims to proceed in federal court, but not in state court.  The Act permits federal courts and state courts alike to entertain state law claims, including challenges to cleanups.

That leads us to the third difficulty with Atlantic Richfield's argument.  We have recognized a "deeply rooted presumption in favor of concurrent state court jurisdiction" over federal claims.  *Tafflin* v. *Levitt*, 493 U. S. 455, 458–459 (1990).  Only an "explicit statutory directive," an "unmistakable implication from legislative history," or "a clear incompatibility between state-court jurisdiction and federal interests" can displace this presumption.  *Id.*, at 460.  Explicit, unmistakable, and clear are not words that describe Atlantic Richfield's knotty interpretation of §§113(b) and (h).

It would be one thing for Atlantic Richfield to try to surmount the clear statement rule that applies to the uncommon, but not unprecedented, step of stripping state courts of jurisdiction over *federal* claims.  But Atlantic Richfield's position requires a more ambitious step: Congress stripping

state courts of jurisdiction to hear their own *state* claims. We would not expect Congress to take such an extraordinary step by implication. Yet the only provision Atlantic Richfield invokes addresses "[f]ederal court[s]" without even mentioning state courts, let alone stripping those courts of jurisdiction to hear state law claims. 42 U. S. C. §9613(h).

Finally, the Government, supporting Atlantic Richfield, emphasizes that the opening clause of §113(b) excepts §113(h) from its application. See 42 U. S. C. §9613(b) ("Except as provided in subsections (a) and (h) of this section . . . ."). According to the Government, because "exceptions must by definition be narrower than the corresponding rule," all challenges to remedial plans under §113(h)—whether based in federal or state law—must "arise under" the Act for purposes of §113(b). Brief for United States as *Amicus Curiae* 25.

We reject the premise and with it the conclusion. "Thousands of statutory provisions use the phrase 'except as provided in . . . ' followed by a cross-reference in order to indicate that one rule should prevail over another in any circumstance in which the two conflict." *Cyan, Inc.* v. *Beaver County Employees Retirement Fund*, 583 U. S. ___, ___ (2018) (slip op., at 9). Such clauses explain what happens in the case of a clash, but they do not otherwise expand or contract the scope of either provision by implication. Cf. *NLRB* v. *SW General, Inc.*, 580 U. S. ___, ___ (2017) (slip op., at 11) (explaining the same principle for "notwithstanding" clauses).

The actions referred to in §113(h) do not fall entirely within §113(b). Challenges to remedial actions under federal statutes other than the Act, for example, are precluded by §113(h) but do not fall within §113(b). To cite another example, §113(h) addresses state law challenges to cleanup plans in federal court, although those actions also do not

Opinion of the Court

fall within §113(b).[6]  At the same time, §113(b) is not sub-
sumed by §113(h).  Many claims brought under the Act,
such as those to recover cleanup costs under §107, are not
challenges to cleanup plans.

Sections 113(b) and 113(h) thus each do work independ-
ent of one another.  The two provisions overlap in a partic-
ular type of case: challenges to cleanup plans in federal
court that arise under the Act.  In such cases, the exceptions
clause in §113(b) instructs that the limitation of §113(h)
prevails.  It does nothing more.

## III

Although the Montana Supreme Court answered the ju-
risdictional question correctly, the Court erred by holding
that the landowners were not potentially responsible par-
ties under the Act and therefore did not need EPA approval
to take remedial action.  Section 122(e)(6), titled "Incon-
sistent response action," provides that "[w]hen either the
President, or a potentially responsible party . . . has initi-
ated a remedial investigation and feasibility study for a
particular facility under this chapter, no potentially respon-
sible party may undertake any remedial action at the facil-
ity unless such remedial action has been authorized by the
President."  42 U. S. C. §9622(e)(6).  Both parties agree that

––––––––––

[6] JUSTICE ALITO argues that our interpretation leaves no meaning for
the exceptions in §113(h) for federal courts hearing state law actions
while sitting in diversity and federal courts hearing actions invoking
state law standards  deemed "applicable or relevant and appropriate" by
the Act.  42 U. S. C. §9613(h).  Because we read §113(b) to cover only
federal law claims, JUSTICE ALITO assumes that these exceptions in
§113(h) would never apply.  But as we explained, §113(h) applies to all
"challenges to removal or remedial action" that make their way into
"[f]ederal court," whether through §113(b) or some other route. §9613(h).
That includes state law challenges arising by way of diversity jurisdic-
tion or supplemental jurisdiction as well as federal law challenges aris-
ing under sources of law other than the Act.  The exceptions in §113(h)
are thus necessary to delineate which of these challenges may proceed in
federal court and which may not.

this provision would require the landowners to obtain EPA
approval for their restoration plan if the landowners qualify
as potentially responsible parties.

To determine who is a potentially responsible party, we
look to the list of "covered persons" in §107, the liability sec-
tion of the Act. §9607(a). "Section 107(a) lists four classes
of potentially responsible persons (PRPs) and provides that
they 'shall be liable' for, among other things, 'all costs of
removal or remedial action incurred by the United States
Government.'" *Cooper Industries, Inc.* v. *Aviall Services,
Inc.*, 543 U. S. 157, 161 (2004) (quoting §9607(a)(4)(A)). The
first category under §107(a) includes any "owner" of "a
facility." §9607(a)(1). "Facility" is defined to include "any
site or area where a hazardous substance has been depos-
ited, stored, disposed of, or placed, or otherwise come to be
located." §9601(9)(B). Arsenic and lead are hazardous sub-
stances. 40 CFR §302.4, Table 302.4. Because those pollu-
tants have "come to be located" on the landowners' proper-
ties, the landowners are potentially responsible parties.

The landowners and JUSTICE GORSUCH argue that even
if the landowners were once potentially responsible parties,
they are no longer because the Act's six-year limitations pe-
riod for recovery of remedial costs has run, and thus they
could not be held liable in a hypothetical lawsuit. 42
U. S. C. §9613(g)(2)(B).

This argument collapses status as a potentially responsi-
ble party with liability for the payment of response costs. A
property owner can be a potentially responsible party even
if he is no longer subject to suit in court. As we have said,
"[E]ven parties not responsible for contamination may fall
within the broad definitions of PRPs in §§107(a)(1)–(4)."
*United States* v. *Atlantic Research Corp.*, 551 U. S. 128, 136
(2007). That includes "'innocent' . . . landowner[s] whose
land has been contaminated by another," who would be
shielded from liability by the Act's so-called "innocent land-
owner" or "third party" defense in §107(b)(3). *Ibid.* See also

Opinion of the Court

42 U. S. C. §9607(b)(3). The same principle holds true for parties that face no liability because of the Act's limitations period.

Interpreting "potentially responsible parties" to include owners of polluted property reflects the Act's objective to develop, as its name suggests, a "Comprehensive Environmental Response" to hazardous waste pollution. Section 122(e)(6) is one of several tools in the Act that ensure the careful development of a single EPA-led cleanup effort rather than tens of thousands of competing individual ones.

Yet under the landowners' interpretation, property owners would be free to dig up arsenic-infected soil and build trenches to redirect lead-contaminated groundwater without even notifying EPA, so long as they have not been sued within six years of commencement of the cleanup.[7] We doubt Congress provided such a fragile remedy for such a serious problem. And we suspect most other landowners would not be too pleased if Congress required EPA to sue each and every one of them just to ensure an orderly cleanup of toxic waste in their neighborhood. A straightforward reading of the text avoids such anomalies.

JUSTICE GORSUCH argues that equating "potentially responsible parties" with "covered persons" overlooks the fact

_____

[7] EPA does have other tools to address serious environmental harm. Under §106, for example, EPA can initiate an injunctive abatement action if it finds an "imminent and substantial endangerment to the public health or welfare or the environment." 42 U. S. C. §9606(a). But EPA may have good reasons to preserve the status quo of a cleanup site even absent an imminent threat. More importantly, the landowners' interpretation would require EPA to monitor tens of thousands of properties across 1,335 Superfund sites nationwide to ensure landowners do not derail an EPA cleanup. EPA, Superfund: National Priorities List (NPL) (Apr. 13, 2020), https://www.epa.gov/superfund/superfund-national-priorities-list-npl. Congress provided a far more effective and efficient solution in §122(e)(6): Landowners at Superfund sites containing hazardous waste must seek EPA approval before initiating their own bespoke cleanups.

Opinion of the Court

that the terms "use different language, appear in different statutory sections, and address different matters." *Post*, at 7 (opinion concurring in part and dissenting in part). He contends that "potentially responsible party" as used in §122(e)(6) should be read as limited to the settlement context, and that if Congress intended the phrase to have broader reach—to refer more generally to those potentially liable under §107(a)—then Congress would have used the term "covered person." *Post*, at 7–8.

But there is no reason to think Congress used these phrases to refer to two distinct groups of persons. Neither phrase appears among the Act's list of over 50 defined terms. 42 U. S. C. §9601. "Covered persons," in fact, appears in the caption to §107(a) and nowhere else. Meanwhile, "potentially responsible parties" are referenced not just in the section on settlements, but also in the Act's sections regarding EPA response authority, cleanup standards and procedures, cleanup contractors, Superfund moneys, Federal Government cleanup sites, and civil proceedings. §§9604, 9605, 9611, 9613, 9619, 9620, 9622. Across the statute "potentially responsible parties" refers to what it says: parties that may be held accountable for hazardous waste in particular circumstances. The only place in the Act that identifies such persons is the list of "Covered persons" in §107(a). Congress therefore must have intended "potentially responsible party" in §122(e)(6) (as elsewhere in the Act) to refer to "Covered persons" in §107(a).

Turning from text to consequences, the landowners warn that our interpretation of §122(e)(6) creates a permanent easement on their land, forever requiring them "to get permission from EPA in Washington if they want to dig out part of their backyard to put in a sandbox for their grandchildren." Tr. of Oral Arg. 62. The grandchildren of Montana can rest easy: The Act does nothing of the sort.

Section 122(e)(6) refers only to "remedial action," a defined term in the Act encompassing technical actions like

Opinion of the Court

"storage, confinement, perimeter protection using dikes, trenches, or ditches, clay cover, neutralization, cleanup of released hazardous substances and associated contaminated materials," and so forth. 42 U. S. C. §9601(24). While broad, the Act's definition of remedial action does not reach so far as to cover planting a garden, installing a lawn sprinkler, or digging a sandbox. In addition, §122(e)(6) applies only to sites on the Superfund list. The Act requires EPA to annually review and reissue that list. §9605(a)(8)(B). EPA delists Superfund sites once responsible parties have taken all appropriate remedial action and the pollutant no longer poses a significant threat to public health or the environment. See 40 CFR §300.425(e).

The landowners and JUSTICE GORSUCH alternatively argue that the landowners are not potentially responsible parties because they did not receive the notice of settlement negotiations required by §122(e)(1). Under a policy dating back to 1991, EPA does not seek to recover costs from residential landowners who are not responsible for contamination and do not interfere with the agency's remedy. EPA, Policy Towards Owners of Residential Property at Superfund Sites, OSWER Directive #9834.6 (July 3, 1991), https://www.epa.gov/sites/production/files/documents/policy-owner-rpt.pdf. EPA views this policy as an exercise of its "enforcement discretion in pursuing potentially responsible parties." *Id.*, at 3. Because EPA has a policy of not suing innocent homeowners for pollution they did not cause, it did not include the landowners in settlement negotiations.

But EPA's nonenforcement policy does not alter the landowners' status as potentially responsible parties. Section 107(a) unambiguously defines potentially responsible parties and EPA does not have authority to alter that definition. See, *e.g.*, *Sturgeon* v. *Frost*, 587 U. S. ___, ___, n. 3 (2019) (slip op., at 16, n. 3). Section 122(e)(1) requires notification of settlement negotiations to all potentially responsible parties. To say that provision determines who is

a potentially responsible party in the first instance would render the Act circular. Even the Government does not claim that its decisions whether to send notices of settlement negotiations carry such authority.

In short, even if EPA ran afoul of §122(e)(1) by not providing the landowners notice of settlement negotiations, that does not change the landowners' status as potentially responsible parties.

The landowners relatedly argue that the limitation in §122(e)(6) on remedial action by potentially responsible parties cannot carry the weight we assign to it because it is located in the Act's section on settlement negotiations. Congress, we are reminded, does not "hide elephants in mouseholes." *Whitman* v. *American Trucking Assns., Inc.*, 531 U. S. 457, 468 (2001).

We take no issue with characterizing §122(e)(6) as an elephant. It is, after all, one of the Act's crucial tools for ensuring an orderly cleanup of toxic waste. But §122 of the Act is, at the risk of the tired metaphor spinning out of control, less a mousehole and more a watering hole—exactly the sort of place we would expect to find this elephant.

Settlements are the heart of the Superfund statute. EPA's efforts to negotiate settlement agreements and issue orders for cleanups account for approximately 69% of all cleanup work currently underway. EPA, Superfund Site Cleanup Work Through Enforcement Agreements and Orders, https://www.epa.gov/enforcement/superfund-site-cleanup-work-through-enforcement-agreements-and-orders. The Act commands EPA to proceed by settlement "[w]henever practicable and in the public interest . . . in order to expedite effective remedial actions and minimize litigation." 42 U. S. C. §9622(a). EPA, for its part, "prefers to reach an agreement with a potentially responsible party (PRP) to clean up a Superfund site instead of issuing an order or paying for it and recovering the cleanup costs later." EPA, Negotiating Superfund Settlements, https://www.epa.

gov/enforcement/negotiating-superfund-settlements.

The Act encourages potentially responsible parties to en-
ter into such agreements by authorizing EPA to include a
"covenant not to sue," which caps the parties' liability to the
Government. §9622(c)(1). The Act also protects settling
parties from contribution claims by other potentially
responsible parties. §9613(f)(2). Once finalized, the terms
of a settlement become legally binding administrative
orders, subject to civil penalties of up to $25,000 a day.
§§9609(a)(1)(E), 9622(*l*).

Moreover, subsection (e) is an important component of
§122. It establishes a reticulated scheme of notices, pro-
posals, and counterproposals for the settlement negotiation
process. §9622(e). And the subsection places a moratorium
on EPA remedial actions while negotiations are under way.
§9622(e)(2)(A). It is far from surprising to find an analo-
gous provision restricting potentially responsible parties
from taking remedial actions in the same subsection.

JUSTICE GORSUCH also contends that our interpretation
violates the Act's "saving clauses," which provide that the
Act does not preempt liability or requirements under state
law. *Post*, at 3–4. But we have long rejected interpretations
of sweeping saving clauses that prove "absolutely incon-
sistent with the provisions of the act" in which they are
found. *American Telephone & Telegraph Co.* v. *Central Of-
fice Telephone, Inc.*, 524 U. S. 214, 228 (1998) (quoting
*Texas & Pacific R. Co.* v. *Abilene Cotton Oil Co.*, 204 U. S.
426, 446 (1907)). Interpreting the Act's saving clauses to
erase the clear mandate of §122(e)(6) would allow the Act
"to destroy itself." *Ibid.*

What is more, Atlantic Richfield remains potentially lia-
ble under state law for compensatory damages, including
loss of use and enjoyment of property, diminution of value,
incidental and consequential damages, and annoyance and
discomfort. The damages issue before the Court is whether

Atlantic Richfield is also liable for the landowners' own remediation beyond that required under the Act. Even then, the answer is yes—so long as the landowners first obtain EPA approval for the remedial work they seek to carry out.

We likewise resist JUSTICE GORSUCH's evocative claim that our reading of the Act endorses "paternalistic central planning" and turns a cold shoulder to "state law efforts to restore state lands." *Post*, at 10. Such a charge fails to appreciate that cleanup plans generally must comply with "legally applicable or relevant and appropriate" standards of state environmental law. 42 U. S. C. §9621(d)(2)(A)(ii). Or that States must be afforded opportunities for "substantial and meaningful involvement" in initiating, developing, and selecting cleanup plans. §9621(f)(1). Or that EPA usually must defer initiating a cleanup at a contaminated site that a State is already remediating. §9605(h). It is not "paternalistic central planning" but instead the "spirit of cooperative federalism [that] run[s] throughout CERCLA and its regulations." *New Mexico* v. *General Elec. Corp.*, 467 F. 3d 1223, 1244 (CA10 2006).

As a last ditch effort, the landowners contend that, even if §107(a) defines potentially responsible parties, they qualify as contiguous property owners under §107(q), which would pull them outside the scope of §107(a). The landowners are correct that contiguous property owners are not potentially responsible parties. Section 107(q)(1)(A) provides that "[a] person that owns real property that is contiguous to or otherwise similarly situated with respect to, and that is or may be contaminated by a release or threatened release of a hazardous substance from, real property that is not owned by that person shall not be considered" an owner of a facility under §107(a). §9607(q)(1)(A). The problem for the landowners is that there are eight further requirements to qualify as a contiguous property owner. §§9607(q)(1)(A)(i)–(viii). Each landowner individually must "establish by a

Opinion of the Court

preponderance of the evidence" that he satisfies the criteria. §9607(q)(1)(B).

The landowners cannot clear this high bar. One of the eight requirements is that, at the time the person acquired the property, the person "did not know or have reason to know that the property was or could be contaminated by a release or threatened release of one or more hazardous substances." §9607(q)(1)(A)(viii)(II). All of the landowners here purchased their property after the Anaconda Company built the Washington Monument sized smelter. Indeed "evidence of public knowledge" of contamination was "almost overwhelming." *Christian* v. *Atlantic Richfield Co.*, 380 Mont. 495, 529, 358 P. 3d 131, 155 (2015). In the early 1900s, the Anaconda Company actually obtained smoke and tailing easements authorizing the disposition of smelter waste onto many properties now owned by the landowners. *Id.*, at 500–501, 358 P. 3d, at 137–138. The landowners had reason to know their property "could be contaminated by a release or threatened release" of a hazardous substance. 42 U. S. C. §9607(q)(1)(A)(viii)(II).

At any rate, contiguous landowners must provide "full cooperation, assistance, and access" to EPA and those carrying out Superfund cleanups in order to maintain that status. §9607(q)(1)(A)(iv). But the Government has represented that the landowners' restoration plan, if implemented, would interfere with its cleanup by, for example, digging up contaminated soil that has been deliberately capped in place. See Brief for United States as *Amicus Curiae* 20–21. If that is true, the landowners' plan would soon trigger a lack of cooperation between EPA and the landowners. At that point, the landowners would no longer qualify as contiguous landowners and we would be back to square one.

\* \* \*

The Montana Supreme Court erred in holding that the landowners were not potentially responsible parties under

§122(e)(6) and therefore did not need to seek EPA approval. Montana law requires that "an award of restoration damages actually . . . be used to repair the damaged property." *Sunburst School Dist. No. 2*, 338 Mont., at 273, 165 P. 3d, at 1089. But such action cannot be taken in the absence of EPA approval. That approval process, if pursued, could ameliorate any conflict between the landowners' restoration plan and EPA's Superfund cleanup, just as Congress envisioned. In the absence of EPA approval of the current restoration plan, we have no occasion to entertain Atlantic Richfield's claim that the Act otherwise preempts the plan.

The judgment of the Montana Supreme Court is affirmed in part and vacated in part. The case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

Opinion of ALITO, J.

# SUPREME COURT OF THE UNITED STATES

————

No. 17–1498

————

## ATLANTIC RICHFIELD COMPANY, PETITIONER *v.* GREGORY A. CHRISTIAN, ET AL.

ON WRIT OF CERTIORARI TO THE SUPREME
COURT OF MONTANA

[April 20, 2020]

JUSTICE ALITO, concurring in part and dissenting in part.

I agree with the Court that the judgment below must be reversed, and I join all of the Court's opinion except Part II–B. I thus agree with the Court that we possess jurisdiction to decide this case. See *ante*, at 8. I also agree that the landowners are potentially responsible parties under §122(e)(6) of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA) and, as a result, cannot bring their Montana restoration damages claim without the consent of the Environmental Protection Agency (EPA). See *ante*, at 13–21. At this point, however, I am not willing to endorse the Court's holding in Part II–B that state courts have jurisdiction to entertain "challenges" to EPA-approved CERCLA plans.

I

I would not decide that question because it is neither necessary nor prudent for us to do so. As I understand the Court's opinion, the Montana Supreme Court has two options on remand: (1) enter a stay to allow the landowners to seek EPA approval or (2) enter judgment against the landowners on their restoration damages claim without prejudice to their ability to refile if they obtain EPA approval. Either way, the case cannot proceed without the EPA's

blessing. And because the EPA has submitted multiple fil-
ings indicating that it believes that the landowners' plan
presents serious environmental risks, it is likely that the
EPA will not approve that plan, and the case will then die.
If that happens, the question of the state courts' jurisdiction
will be academic.

Alternatively, if the EPA approves the landowners' plan,
either in full or to a degree that they find satisfactory, they
may not wish to press this litigation. And if they do choose
to go forward, the question of state-court jurisdiction can be
decided at that time.

For these reasons, there is no need to reach out and de-
cide the question now,[1] and there are good reasons not to do
so. While the question of state-court jurisdiction may turn
out not to matter in this case, that question may have im-
portant implications in other cases. Specifically, if the fears
expressed by the Government materialize, state courts and
juries, eager to serve local interests, may disregard the
EPA's expert judgment regarding the best plan for a
CERCLA site and may mandate relief that exacerbates en-
vironmental problems. See Brief for United States as *Ami-
cus Curiae* 20–22, 29–30; App. to Pet. for Cert. 72a–74a.
Thus, much is potentially at stake, and the question
whether CERCLA allows state courts to entertain suits like
the one in this case depends on the interpretation of devil-
ishly difficult statutory provisions, CERCLA §§113(b) and
(h), 42 U. S. C. §§9613(b) and (h).

With much at stake, we should be confident that our an-
swer is correct, and we have no basis for such confidence

---

[1] We may not decide the merits of a case without assuring ourselves
that we have jurisdiction, *Steel Co.* v. *Citizens for Better Environment*,
523 U. S. 83, 94–95 (1998), but nothing requires us to decide whether the
Montana courts have jurisdiction before remanding, see S. Shapiro et al.,
Supreme Court Practice §3.26, p. 3–94 (11th ed. 2019); cf. *Andresen* v.
*Maryland*, 427 U. S. 463, 469, n. 4 (1976) (declining to address question
presented "does not, of course, affect our jurisdiction").

here. The question of state-court jurisdiction is only one of many in this case, and the briefing and argument on that issue left important questions without fully satisfactory answers. The Court tries to clear up what §113 means, but as I will attempt to show, the Court's interpretation presents serious problems. Under these circumstances, the better course is not to decide this perplexing question at this juncture.

## II
## A

CERCLA §113 is like a puzzle with pieces that are exceedingly difficult, if not impossible, to fit together. Here is what these provisions say, with language that is not pertinent for present purposes omitted:

> "(b) Jurisdiction; venue
>
> "Except as provided in subsectio[n] . . . (h) of this section [and another provision not relevant for present purposes], the United States district courts shall have exclusive original jurisdiction over all controversies arising under this chapter, without regard to the citizenship of the parties or the amount in controversy. . . .

> .        .        .        .        .

> "(h) Timing of review
>
> "No Federal court shall have jurisdiction under Federal law other than under section 1332 of title 28 (relating to diversity of citizenship jurisdiction) or under State law which is applicable or relevant and appropriate under section 9621 of this title [CERCLA §121, 42 U. S. C. §9621] (relating to cleanup standards) to review any challenges to removal or remedial action selected under section 9604 of this title, or to review any order issued under section 9606(a) of this title [concerning emergency measures ordered by the President], in

any action except one of [a list of specific CERCLA provisions]."  42 U. S. C. §9613.

For present purposes, the pertinent parts are as follows:

- First, §113(b) sets out a general rule conferring on the federal district courts exclusive jurisdiction over claims "arising under" CERCLA.  And it does so "without regard to the citizenship of the parties or the amount in controversy."
- Second, §§113(b) and (h), taken together, reduce this grant of jurisdiction by taking away jurisdiction over *most* claims that "challeng[e]" a "removal or remedial action."
- Third, this reduction does not apply to a challenge to removal or remedial action if it is brought under the diversity jurisdiction statute, 28 U. S. C. §1332.
- Fourth, this reduction also does not apply to a challenge to removal or remedial action if it is brought in federal court "under State law which is applicable or relevant and appropriate under [§121] (relating to cleanup standards)."  Under §121, cleanup standards must comply with certain state-law requirements, and thus the thrust of this last provision seems to be that a removal or remedial action may be challenged in federal court for noncompliance with such requirements.

With these pieces laid out, we may consider how the Court and respondents, on the one hand, and the Government and petitioner, on the other, try to fit them together.

## B

The logical first step in any effort to understand how §§113(b) and (h) apply to the landowners' state-law restoration damages claim is to determine whether the claim falls within the scope of the exclusive jurisdiction that §113(b) confers on the federal district courts—in other words, whether such a claim is one that "aris[es] under" CERCLA.

Opinion of ALITO, J.

If it does not, then that ends the inquiry.  And that is what
the Court holds.  *Ante*, at 8–9.

The Court interprets the phrase "arising under" in
§113(b) to mean the same thing as that phrase means in the
federal-question  jurisdiction  statute,  28  U. S. C.  §1331.
Under that provision, as the Court puts it, "[i]n the mine
run of cases, '[a] suit arises under the law that creates the
cause of action.'" *Ante*, at 9 (quoting *American Well Works
Co.* v. *Layne & Bowler Co.*, 241 U. S. 257, 260 (1916)).  Thus,
the Court concludes, a claim arises under CERCLA only if
it is based on CERCLA, and since the landowners' restora-
tion damages claim is based on Montana law, it is obviously
not based on CERCLA and does not fall within the exclusive
jurisdiction conferred on the district courts by §113(b).  This
makes short work of the question of state-court jurisdiction,
but it presents serious problems.

First, it cannot explain why §113(b) says that the juris-
diction it confers is "without regard to the citizenship of the
parties or the amount in controversy."  If that jurisdiction
is limited to claims that are based on CERCLA, district
courts have jurisdiction to entertain all those claims under
28 U. S. C. §1331, which does not require either diversity or
any minimum amount in controversy.  So why go out of the
way to say that §113(b) jurisdiction does not require diver-
sity or any minimum amount in controversy?  The only log-
ical reason is to ensure that the provision covers suits that
*could not be brought under 28 U. S. C. §1331*.  Thus, §113(b)
jurisdiction must be broader than general federal-question
jurisdiction.  By denying this, the Court's interpretation
turns the phrase "without regard to the citizenship of the
parties or the amount in controversy" into a meaningless
and useless appendage.

Second, under the Court's interpretation, there is no rea-
son why §113(h) should specify that its reduction of the
scope of the jurisdiction conferred by §113(b) does not affect

a district court's jurisdiction in diversity cases. If the juris-
diction granted by §113(b) is limited to claims based on
CERCLA, why would anyone think that it had any impact
on state-law claims?[2]

Third, if the jurisdiction conferred by §113(b) is limited to
claims based on CERCLA, it is unclear how a district court
could entertain a claim "under State law which is applicable
or relevant and appropriate under [§121] (relating to
cleanup standards)." Yet §113(h) exempts such a claim
from its general withdrawal of jurisdiction over challenges
to removal or remedial action. It seems clear that Congress
did not regard these claims as claims under CERCLA itself,
since it describes them as "under State law" and did not in-
clude them on the list of claims under CERCLA that it like-
wise exempted from §113(h)'s general withdrawal of juris-
diction over challenges to removal or remedial action.
§§113(h)(1)–(5). These three problems raise serious doubt
about the correctness of the Court's interpretation.[3]

---

[2] The Court answers that §§113(b) and (h), though partially overlap-
ping, are "independent" of each other. *Ante,* at 13, and n. 6. But this
conclusion rests on an uneasy premise: that §113(b) pertains only to
causes of action based on CERCLA. There is reason to doubt that this is
the best reading of the statute. See *supra,* at 4–5 and this page.

[3] The Court chalks up §113(b)'s references to amount in controversy
and party citizenship to a "belt and suspenders" approach. *Ante,* at 10,
n. 5. As the Court sees it, Congress must have wanted to make especially
clear that "*all* CERCLA lawsuits," no matter the amount in dispute or
the citizenship of the parties, would be welcome in (and limited to) those
courts. *Ibid.*

It is true that "instances of surplusage are not unknown" in federal
statutes. *Arlington Central School Dist. Bd. of Ed.* v. *Murphy,* 548 U. S.
291, 299, n. 1 (2006). But it is also the case that the Court usually seeks
to "avoid a reading which renders some words altogether redundant."
*Gustafson* v. *Alloyd Co.,* 513 U. S. 561, 574 (1995). In interpreting §113,
one way to avoid redundancy is to acknowledge the interlocking relation-
ship between §§113(b) and (h). Section 113(b) refers to the hallmarks of
diversity jurisdiction (amount in controversy and diversity), and §113(h)
makes clear that its clawback of jurisdiction over some "challenges" to
EPA plans does not affect state-law claims that satisfy 28 U. S. C. §1332.

Opinion of ALITO, J.

### C

The Government and petitioner advance a different interpretation of §§113(b) and (h), and although this interpretation solves the problems noted above, it has problems of its own. The Court, as noted, runs into trouble by interpreting the phrase "arising under" CERCLA in §113(b) to mean what "arising under" means in 28 U. S. C. §1331. The Government obviates this difficulty by arguing that "arising under" in §113(b) has a broader meaning, such as the meaning of the same phrase in Article III of the Constitution. See Brief for United States as *Amicus Curiae* 23–24. The Government suggests that "arising under" in §113(b) may reach "'any case or controversy that might call for the application of federal law.'" *Id.*, at 24 (quoting *Verlinden B. V.* v. *Central Bank of Nigeria*, 461 U. S. 480, 492 (1983)). If §113(b) uses the phrase in something like this sense, the jurisdiction it confers can reach some claims under state law, and that would explain §113(b)'s specification that this jurisdiction is not dependent on either diversity or amount in controversy. In other words, this language makes clear that federal district courts have jurisdiction to hear these state-law claims without the restrictions that usually apply when federal courts entertain such claims.

Up to this point, the interpretation favored by the Government and petitioner proceeds smoothly, but it stumbles when it moves from §113(b) to §113(h). That provision reduces the grant of jurisdiction in §113(b) by taking away jurisdiction over challenges to removal and remedial action unless, among other things, those claims are brought in a diversity action. The upshot is that federal district courts are left with jurisdiction over most state-law claims that challenge removal and remedial action only where the parties are diverse.[4] If it turns out that diversity is lacking,

_____

[4] They also retain jurisdiction over claims "under State law which is applicable or relevant and appropriate under [§121] (relating to cleanup

the district courts cannot entertain the same claims.  And not only that.  Because §113(b)'s grant of jurisdiction to the federal district courts is exclusive, the state courts cannot entertain those claims either.

It is hard to fathom why Congress might have wanted such a scheme.  Congress might have wanted all the state-law claims covered by §113(b) to be heard exclusively in federal court in order to prevent state courts and juries from unduly favoring home-state interests.  But having granted the federal district courts jurisdiction to hear these claims in §113(b), why would Congress take away that jurisdiction in cases where the parties happen not to be diverse?  And why would Congress go further and prevent the state courts from hearing these claims?  The Government and petitioner provide no answer, and none is apparent.

### III

The Court gives three reasons for resolving the question of state-court jurisdiction.  See *ante*, at 9, n. 3.  None is compelling.

First, the Court explains that "Atlantic Richfield seeks more than a remand," namely, it seeks a remand with instructions to dismiss on jurisdictional grounds.  *Ibid.*  But Atlantic Richfield presented its §122(e)(6) theory as an alternate ground for reversal, and has prevailed on that basis.  As Atlantic Richfield's counsel stated at argument, the §122(e)(6) ruling is "sufficient to resolve the case."  Tr. of Oral Arg. 17–18.

Second, the Court says, "leaving the [§113] question unanswered . . . would leave the parties in a state of uncertainty."  *Ante*, at 9, n. 3.  But, as described above, there appears to be a slim chance that this case will, at least in its current state, "procee[d]" in the Montana courts.  *Ibid.*

———————

standards)."  §113(h).

Opinion of ALITO, J.

Third, the Court suggests that the grant of review, briefing, and argument on §113 may warrant resolving the question of state-court jurisdiction. *Ibid.* But that presentation has not cleared up serious issues surrounding §§113(b) and (h). And sunk costs cannot justify a departure from our usual practice of "deciding only what is necessary to the disposition of the immediate case." *Whitehouse* v. *Illinois Central R. Co.*, 349 U. S. 366, 373 (1955).

\*     \*     \*

Section 113 may simply be a piece of very bad draftsmanship, with pieces that cannot be made to fit together. Or it may be a puzzle with a solution that neither the parties, the Court, nor I have been able to solve. In a later case, briefing and argument may provide answers that have thus far eluded us. Since we are not required to attempt an answer in this case, the prudent course is to hold back.

Opinion of GORSUCH, J.

# SUPREME COURT OF THE UNITED STATES

––––––––––

No. 17–1498

––––––––––

## ATLANTIC RICHFIELD COMPANY, PETITIONER *v.* GREGORY A. CHRISTIAN, ET AL.

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF MONTANA

[April 20, 2020]

JUSTICE GORSUCH, with whom JUSTICE THOMAS joins, concurring in part and dissenting in part.

For nearly a century, Atlantic Richfield's predecessor operated a smelter near the town of Opportunity, Montana. At one time, the smelter produced much of the Nation's copper supply and served as the State's largest employer. App. 311. Eventually, though, it became apparent the smelter was producing more than just copper and jobs. Studies showed that the plant emitted up to 62 tons of arsenic and 10 tons of lead each day. Brief for Respondents 7. Thanks to what was once the world's tallest brick smokestack, these heavy metals blanketed the town and the whole of the Deer Lodge Valley—contaminating hundreds of square miles. Today, the smokestack is all that is left of the once massive operation. It stands alone in a state park, much of which remains dangerously contaminated and closed to the public. Visitors may view the stack, but only from a distance, through fences and between huge slag piles. *Id.*, at 9.

This case involves nearly 100 nearby residents. Some have lived in their homes for decades, some long before the environmental consequences of the smelter were fully appreciated. They say they have thought about moving, but for many their property values aren't what they once were. Besides, as one homeowner put it, "I couldn't find a kitchen door that's got all my kids' heights on it." *Id.*, at 8.

Opinion of GORSUCH, J.

The federal government has tried to help in its own way. In 1983, the government designated the 300-square-mile area surrounding the smelter a Superfund site under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA), 94 Stat. 2767, as amended, 42 U. S. C. §9601 *et seq.* After years of study and negotiation, the government ordered Atlantic Richfield to remove up to 18 inches of soil in residential yards with arsenic levels exceeding 250 parts per million (ppm).  App. 94–95.  For so-called "pasture land"—that is, nearly everything else—the government set the threshold for soil removal at 1,000 ppm.  Brief for Respondents 8.  By way of reference, even 100 ppm is sometimes considered too toxic for local landfills, and the federal government itself has elsewhere set a threshold of 25 ppm.  *Ibid.*  Some States set residential cleanup levels as low as 0.04 ppm.  *Ibid.*

The cleanup work that followed left much to be desired. By 2016, Atlantic Richfield claimed that it had virtually finished work on the landowners' properties.  Yet, only 24 of their 77 properties had been remediated, and only about 5 percent of the total acreage had been touched.  *Id.,* at 9.  Soil near Tammy Peters's daycare playground, for example, still shows an arsenic level of 292 ppm.  But because the "weighted average" for her yard is below 250 ppm, Atlantic Richfield performed no cleanup of the playground at all. *Id.,* at 10.

So the landowners here proceeded as landowners historically have:  They sought remedies for the pollution on their lands in state court under state law.  Their choice can come as no surprise.  The federal government enjoys no general power to regulate private lands; it may intervene only consistent with the Commerce Clause or some other constitutionally enumerated power.  Nor does the federal government always intervene as fully as it might even when it can. Meanwhile, the regulation of real property and the protec-

Opinion of GORSUCH, J.

tion of natural resources is a traditional and central responsibility of state governments.  And States have long allowed landowners to seek redress for the pollution of their lands through ancient common law causes of action like nuisance and trespass.  The landowners employed exactly these theories when they brought suit in state court seeking restoration damages from Atlantic Richfield—money that could be used only to remove arsenic, lead, and other toxins from their properties.  The Montana Supreme Court has held that the landowners' case states a viable claim for relief and warrants trial.

Now, however, Atlantic Richfield wants us to call a halt to the proceedings.  The company insists that CERCLA preempts and prohibits common law tort suits like this one.  On Atlantic Richfield's telling, CERCLA even prevents private landowners from voluntarily remediating their own properties at their own expense.  No one may do anything in 300 square miles of Montana, the company insists, without first securing the federal government's permission.

But what in the law commands that result?  Everything in CERCLA suggests that it seeks to supplement, not supplant, traditional state law remedies and promote, not prohibit, efforts to restore contaminated land.  Congress hardly could have been clearer.  It stated that, "[n]othing in this [Act] shall be construed or interpreted as preempting any State from imposing any additional liability or requirements with respect to the release of hazardous substances within such State."  42 U. S. C. §9614(a).  It added that "[n]othing in this [Act] shall affect or modify in any way the obligations or liabilities of any person under other Federal or State law, including common law, with respect to releases of hazardous substances or other pollutants or contaminants."  §9652(d).  And it said again that "[t]his [Act] does not affect or otherwise impair the rights of any person under Federal, State, or common law, except with respect to the timing of review as provided" elsewhere in provisions

that even the Court today does not invoke as limits on re-
covery here. §9659(h). Three times Congress made its
point as plainly as anyone might.

So how does Atlantic Richfield seek to transform
CERCLA from a tool to aid cleanups into a ban on them?
The company has to point to *something* in the statutory text
that trumps these many provisions and preempts the land-
owners' right to use state law to restore their lands. After
all, merely "[i]nvoking some brooding federal interest or ap-
pealing to a judicial policy preference should never be
enough to win preemption of a state law"; instead, a party
like Atlantic Richfield seeking to displace state law must
identify "'a constitutional text or a federal statute' that does
the displacing." *Virginia Uranium, Inc.* v. *Warren*, 587
U. S. ___, ___ (2019) (opinion of GORSUCH, J.) (slip op., at 3)
(quoting *Puerto Rico Dept. of Consumer Affairs* v. *ISLA Pe-
troleum Corp.*, 485 U. S. 495, 503 (1988)).

In answer, Atlantic Richfield directs our attention to
§122(e)(6). It's a provision buried in a section captioned
"Settlements." The section outlines the process private par-
ties must follow to negotiate a settlement and release of
CERCLA liability with the federal government. Subsection
(e)(6) bears the title "Inconsistent response action" and
states that, "[w]hen either the President, or a potentially
responsible party pursuant to an administrative order or
consent decree under this chapter, has initiated a remedial
investigation and feasibility study for a particular facility
under this chapter, no potentially responsible party may
undertake any remedial action at the facility unless such
remedial action has been authorized by the President." 42
U. S. C. §9622(e)(6). So even read for all its worth, this pro-
vision only bars those "potentially responsible" to the fed-
eral government from initiating cleanup efforts without
prior approval. To get where it needs to go, Atlantic Rich-
field must find some way to label the innocent landowners
here "potentially responsible part[ies]" on the hook for

Opinion of GORSUCH, J.

cleanup duties with the federal government.

They are hardly that. When interpreting a statute, this Court applies the law's ordinary public meaning at the time of the statute's adoption, here 1980. See *Wisconsin Central Ltd.* v. *United States*, 585 U. S. ___, ___ (2018) (slip op., at 9). To be "potentially responsible" for something meant then, as it does today, that a person could *possibly* be held accountable for it; the outcome is *capable of* happening. American Heritage Dictionary 1025 (1981); Webster's New Collegiate Dictionary 893 (1980). And there is simply no way the landowners here are potentially, possibly, or capable of being held liable by the federal government for anything. In the first place, the federal government never notified the landowners that they might be responsible parties, as it must under §122(e)(1). Additionally, everyone admits that the period allowed for bringing a CERLCA claim against them has long since passed under §113(g)(2)(B). On any reasonable account, the landowners are potentially responsible to the government for exactly nothing.

Statutory context is of a piece with the narrow text. Nothing in §122 affects the rights of strangers to the federal government's settlement process. Everything in the section speaks to the details of that process. The section requires the government to provide all potentially responsible parties with notice that they might be held responsible for remedial measures. §9622(e)(1). It instructs the government to give a potentially responsible party a list of everyone else so designated. *Ibid.* It specifies procedures for sharing proposals and counterproposals among this group. §§9622(e)(2)–(3). It allows the government to release from federal liability those who agree to settle and clean up hazardous sites. See §§9622(a)–(c). And because parties who settle with the federal government may seek cleanup costs they incurred prior to settlement from other potentially re-

sponsible parties, subsection (e)(6) bars a potentially re-
sponsible party from taking unauthorized remedial
measures. See §§922(e)(1)–(3), (h). This ensures the gov-
ernment can control the shape of any final settlement and
no private party can unilaterally incur costs that it might
then foist on others. At the end of it all, the section does
just what its title suggests. It governs the *settlement* pro-
cess among those who have *something to settle*. It says
nothing about the rights and duties of individuals who, like
the landowners here, have nothing to settle because they
face no potential liability.

Then there's what the rest of the statute tells us. As
we've seen, CERCLA says again and again that it does not
impair the rights of individuals under state law. That in-
struction makes perfect sense and does plenty of work if
§122 only requires those potentially liable to the federal
government to secure permission before engaging in
cleanup efforts. By contrast, reading §122 to bar nearly
everyone from undertaking remedial efforts without federal
permission renders CERCLA's many and emphatic prom-
ises about protecting existing state law rights practically
dead letters. Sure, the federal government would still have
to "involv[e]" state officials and comply with state laws—or
at least those laws federal agency employees deem "rele-
vant and appropriate." §§9621(f)(1), (d)(2)(A)(ii). But
CERCLA would promise nothing more than observer status
for state law and those who wish to rely on it. States and
private landowners alike who lack any potential federal li-
ability could be barred even from undertaking remedial ef-
forts on their own lands at their own expense, required in-
stead to host toxic wastes involuntarily and indefinitely.
Rather than supplementing state remedial efforts,
CERCLA would rule them all.

Reading CERCLA this way would raise uneasy constitu-
tional questions too. If CERCLA really did allow the federal
government to order innocent landowners to house another

party's pollutants involuntarily, it would invite weighty
takings arguments under the Fifth Amendment.    See
*Loretto* v. *Teleprompter Manhattan CATV Corp.*, 458 U. S.
419, 421 (1982).  And if the statute really did grant the fed-
eral government the power to regulate virtually each shov-
elful of dirt homeowners may dig on their own properties, it
would sorely test the reaches of Congress's power under the
Commerce Clause.  See *National Federation of Independent
Business* v. *Sebelius*, 567 U. S. 519, 551–553 (2012).

Atlantic Richfield's replies do nothing to address these
problems.  Instead of making some helpful textual or con-
textual rejoinder about §122, the company asks us look
somewhere else entirely.  Now, Atlantic Richfield says, we
should direct our attention to §107, a provision that lists
four classes of "[c]overed persons" the federal government
is authorized to sue under CERCLA.  One of these classes
encompasses any person who owns a "facility" where haz-
ardous waste has "come to be located." §§9607, 9601(9).  Be-
cause the landowners' properties qualify as "facilit[ies]"
where Atlantic Richfield's waste has come to be located,
everyone admits the landowners themselves are "[c]overed
persons."  And, according to Atlantic Richfield, this neces-
sarily means they are *also* "potentially responsible
part[ies]" subject to §122(e)(6)'s requirement that they seek
federal permission before proceeding with any cleanup.

But notice the linguistic contortion and logical leap.  Lin-
guistically, §107 identifies the "[c]overed persons" the gov-
ernment is authorized to sue.  Section 122 requires a "po-
tentially responsible party" seeking settlement with and
discharge of liability from the federal government to obtain
its permission before engaging in a cleanup.  The terms use
different language, appear in different statutory sections,
and address different matters.  Nor are these two sections
the only ones like them.  CERCLA differentiates between
covered persons and potentially responsible parties in
many places: Some sections apply to all persons covered by

§107 (see, *e.g.,* 42 U. S. C. §§9619(d), 9624(b)), while others extend their mandates only to potentially responsible parties (see, *e.g.,* §§9604, 9605, 9611). Logically, too, the concepts are distinct. Yes, a potentially responsible party must be a covered person the government is authorized to sue. But the inverse does not follow. It is possible to be a person the government is authorized to sue without also being a person the government has chosen to single out for potential responsibility. Atlantic Richfield's argument, thus, essentially proceeds like this: Disregard the differences in language; then assume Congress chose its terms randomly throughout the law; and, finally, conflate logically distinct concepts.

Our case illustrates the significance of the distinction Congress drew and Atlantic Richfield would have us ignore. Maybe the federal government was once authorized by §107 to include the innocent landowners here in a CERCLA suit. But few statutes pursue their purpose single-mindedly or require their full enforcement. And as we've seen, at least two things happened that preclude these landowners from being held responsible for anything: The government chose not to notify them of potential liability under §122(e)(3), and it declined to bring suit within the period prescribed by §113(g)(2)(B). Under the plain and ordinary meaning of the statutory terms before us, these landowners are not potentially responsible parties and CERCLA doesn't require them to seek permission from federal officials before cleaning their own lands. If Congress had wished to extend its ask-before-cleaning rule to every covered person—including those the government chooses not to pursue for potential liability—all it had to do was say so. Congress displayed no trouble using the term "[c]overed persons" elsewhere in the statute. See, *e.g.,* §§9619(d), 9624(b)(2). Conspicuously, it made a different choice here.

Without any plausible foundation in the statute to sup-

Opinion of GORSUCH, J.

port its position, Atlantic Richfield resorts to this odd argument. Maybe the terms "[c]overed persons" and "potentially responsible party" are different and the statute uses them in different places to do different things. But, the company insists, we must conflate them now because this Court has conflated them before. In particular, Atlantic Richfield points to language in *United States* v. *Atlantic Research Corp.*, 551 U. S. 128 (2007), where the Court spoke of "Section 107(a) [as] defin[ing] four categories of PRPs [potentially responsible parties]." *Id.*, at 131–132.

That may be so but it does not make it so. The relationship between the terms "[c]overed persons" under §107 and "potentially responsible part[ies]" under §122 is of critical importance in this case, but it was not briefed, argued, or decided in *Atlantic Research*. Instead, the only question there concerned the meaning of the term "[c]overed persons" under §107. Though the Court employed the term "PRP" to describe "[c]overed persons," nothing turned on the use or meaning of the acronym: Replace every reference to "PRP" with "[c]overed person" and the Court's holding and reasoning remains the same. This Court has long warned that matters "'lurk[ing] in the record, neither brought to the attention of the court nor ruled upon,'" should not be read as having decided anything. *Cooper Industries, Inc.* v. *Aviall Services, Inc.*, 543 U. S. 157, 170 (2004) (quoting *Webster* v. *Fall,* 266 U. S. 507, 511 (1925)). We have warned, too, against reading our judicial opinions as if they were some sort of legislative code because, otherwise, innocent and inconsequential judicial remarks might mistakenly come to trump democratically adopted laws. See *Reiter* v. *Sonotone Corp.*, 442 U. S. 330, 341 (1979). Atlantic Richfield would have us ignore these teachings and confuse a stray remark with a rule of law.

In the end, the company's case cannot help but be seen for what it really is: an appeal to policy. On its view, things would be so much more orderly if the federal government

ran everything.  And, let's be honest, the implication here
is that property owners cannot be trusted to clean up their
lands without causing trouble (especially for Atlantic Rich-
field).  Nor, we are told, should Montanans worry so much:
The restrictions Atlantic Richfield proposes aren't really
*that* draconian because homeowners would still be free to
do things like build sandboxes for their grandchildren (pro-
vided, of course, they don't scoop out too much arsenic in
the process).

But, as in so many cases that come before this Court, the
policy arguments here cut both ways.  Maybe paternalistic
central planning cannot tolerate parallel state law efforts
to restore state lands.  But maybe, too, good government
and environmental protection would be better served if
state law remedies proceeded alongside federal efforts.
State and federal law enforcement usually work in just this
way, complementing rather than displacing one another.
And, anyway, how long would Atlantic Richfield have us en-
force what amounts to a federal easement requiring land-
owners to house toxic waste on their lands?  The govern-
ment has been on site since 1983; work supposedly finished
around the landowners' homes in 2016; the completion of
"primary" cleanup efforts is "estimated" to happen by 2025.
So, yes, once a Superfund site is "delisted," the restrictions
on potentially responsible parties fade away.  But this pro-
ject is well on its way to the half-century mark and still only
a "preliminary" deadline lies on the horizon.  No one before
us will even hazard a guess when the work will finish and
a "delisting" might come.  On Atlantic Richfield's view, gen-
erations have come and gone and more may follow before
the plaintiffs can clean their land.

The real problem, of course, is that Congress, not this
Court, is supposed to make judgments between competing
policy arguments like these.  And, as we've seen, Congress
has offered its judgment repeatedly and clearly.  CERCLA

Opinion of Gorsuch, J.

sought to add to, not detract from, state law remedial efforts. It endorsed a federalized, not a centralized, approach to environmental protection. What if private or state cleanup efforts really do somehow interfere with federal interests? Congress didn't neglect the possibility. But instead of requiring state officials and local landowners to beg Washington for permission, Congress authorized the federal government to seek injunctive relief in court. See §9606(a). Atlantic Richfield would have us turn this system upside down, recasting the statute's presumption in favor of cooperative federalism into a presumption of federal absolutism.

While I agree with the Court's assessment in Parts I and II of its opinion that we have jurisdiction to hear this case, I cannot agree with its ruling on the merits in Part III. Departing from CERCLA's terms in this way transforms it from a law that supplements state environmental restoration efforts into one that prohibits them. Along the way, it strips away ancient common law rights from innocent landowners and forces them to suffer toxic waste in their backyards, playgrounds, and farms. Respectfully, that is not what the law was written to do; that is what it was written to prevent.